74 F.3d 1242
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Fannie JONES, Plaintiff-Appellant,
v.
Jesse BROWN, Secretary, Department of Veterans Affairs,
Defendant-Appellee.
 No. 94-3236.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 3, 1995.
Decided Jan. 19, 1996.
 
 Before CUMMINGS, ESCHBACH and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Fannie Jones filed a complaint against the United States Department of Veterans Affairs ("VA") alleging that she was terminated from the VA because of her race (she is African-American) and in retaliation for filing an Equal Opportunity ("EEO") Complaint of race discrimination, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e, et seq. A bench trial was held and the district court entered judgment in favor of the VA and against Jones. On appeal, Jones argues that the district court's entry of judgment was in error. For the following reasons, the judgment of the district court is affirmed.
 
 Facts
 
 2
 Fannie R. Jones was employed by the VA at the Hines VA Hospital ("Hines") in Hines, Illinois as a licensed practical nurse ("LPN") from 1967 until 1989. In 1979, Jones completed nursing school in preparation to become a registered nurse ("RN"). After nine years and several unsuccessful attempts at passing the nursing board exams, Jones became a licensed RN and applied for RN positions at Hines. Her applications were denied. On December 27, 1988, Jones filed an EEO complaint against Hines alleging racial discrimination for failure to place her in an RN position. This complaint was settled when Hines agreed to place Jones in an RN position effective September, 1989. Since Jones had completed her nursing schooling ten years ago, Hines required that Jones take a refresher nursing course.
 
 
 3
 During her two-year probationary period, Jones was placed in Unit 2B of the Spinal Cord Injury ("SCI") Service, where the majority of the patients are paraplegic or quadriplegic. New RNs at Hines are required to participate in a four-week centralized orientation regarding hospital procedures and policies and an eight-hour course concerning patient care. This is followed by a continuing orientation period where the RN is assigned a preceptor who acts as a guide to the new nurse until she demonstrates an ability to perform her duties independently. After Jones completed the centralized orientation and the eight-hour course, the head nurse of Unit 2B, Denise DiBiaso (a white female), assigned Barbara LaVant, who is also white, to be Jones' preceptor. LaVant continued to be Jones' preceptor from October 1989 through March 1990. When LaVant took time off in December 1989, Sylvia Quandt, a white RN, was Jones' substitute preceptor. When LaVant left for surgery in March 1990, Quandt again substituted as preceptor for Jones. Jones, however, became dissatisfied with Quandt and at Jones' request, in April 1990, DiBiaso assigned Ethel Fears, an RN of African-American descent, as Jones' preceptor.
 
 
 4
 Although the average length of precepted orientation is two to three months, Jones' orientation was never completed. Beginning in November 1989, and continuing through March of 1990, DiBiaso was informed of repeated deficiencies in Jones' performance by Jones' superiors during her probationary period as an RN. In March of 1990, DiBiaso informed her supervisor, Margaret Kraft (a white female), Associate Chief of Nursing, that Jones was having difficulties interacting with patients and staff, with calculating medication dosages, and with responding to emergency situations. An interim proficiency rating was conducted in April 1990 and Jones received a rating of "low satisfactory." Kraft and DiBiaso discussed this rating with Jones. Kraft then recommended to Mildred Brown, Chief of Nursing, that a Nurse Professional Standards Board ("Review Board") review Jones' performance as an RN and determine whether she should be discharged. Kraft made this recommendation based on Jones' failure to improve her performance despite counselling, further training, and an extension of her orientation period. Brown agreed with Kraft's recommendation and the Review Board convened in August 1990. Before the Review Board convened, however, DiBiaso removed Jones from direct patient care duties effective July 9, 1990, and reassigned her to clerical duties in Nursing Education. After this reassignment, Jones filed a second EEO complaint on November 30, 1990, which was dismissed as untimely.
 
 
 5
 Jones' Review Board was assembled by Mildred Brown. Barbara Negles, Associate Chief of Nursing, was appointed chairperson of the Review Board. The Board was composed of five nurses and an employee from the personnel department. Its racial and gender makeup included two white females, an Asian-American female, an African-American female, and a white male. The members of the Board were selected on the basis of having no independent knowledge of the events leading to the review. The Board found that the record, composed of communications concerning Jones' performance as an RN, her personnel folder, documents provided by Jones, the testimony of DiBiaso, Kraft, and Bernadette Pohlmann (clinical nurse educator and quality assurance coordinator for the SCI Service) and Jones' own testimony, demonstrated "patterns and repetitions indicating unsafe practice." The Review Board's unanimous recommendation was to terminate Jones from service as an RN. This recommendation was made on August 16, 1990.[1]
 
 
 6
 The Board's findings were forwarded to the Central Office of the Nurse Professional Standards Board and the VA Chief Medical Director in Washington, D.C. Both authorities concurred. As acting Director of Hines, Dr. William Best reviewed the board's decision and approved the termination. However, Dr. Best suggested to Brown that Jones be reinstated as an LPN. Jones was terminated from the VA on February 8, 1991. She was not reinstated as an LPN. Jones filed a third EEO complaint on March 28, 1991, alleging that her discharge without reinstatement was motivated by race and was in retaliation for exercising her EEO rights. After the complaint was investigated, both the VA and the Equal Opportunity Commission found that the hospital's removal of Jones from service was not motivated by discrimination or retaliation. Jones filed a complaint in district court for employment discrimination against the VA. Following a three-day bench trial, the district court entered judgment in favor of the VA and against Jones. This timely appeal follows.
 
 Issues
 
 7
 On appeal, Jones claims that judgment should have been entered in her favor for the following reasons: (1) she presented a prima facie case of racial discrimination and retaliatory discharge, and the VA failed to offer any explanation why she was not reinstated as an LPN; and (2) the evidence clearly established that the decision to discharge Jones without reinstatement was based on racial discrimination and retaliation.
 
 Discussion
 
 8
 Jones first argues that under McDonnell Douglas, the district court was required to enter judgment in her favor. We disagree. Under section 704 of Title VII, it is unlawful "to discharge any individual ... because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. Sec. 2000e-2(a)(1), or "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]," 42 U.S.C. Sec. 2000e-3(a). Jones complains of disparate treatment; i.e., that her discharge as an RN without reinstatement as an LPN was the result of intentional discrimination and retaliation in violation of Title VII. She can support her claim of discrimination and retaliation "either through direct proof of discriminatory [or retaliatory] intent, or through the indirect, burden-shifting method of proof first elaborated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Zuckerstein v. Argonne National Laboratory, 984 F.2d 1467, 1472 (7th Cir.1993). For lack of direct evidence, Jones proceeded with the McDonnell Douglas burden-shifting method of proof.
 
 
 9
 A prima facie case of racial discrimination resulting in discharge is established by showing (1) that the employee is a member of a protected group; (2) that her performance met her employer's legitimate expectations; (3) that she was discharged; and (4) that her employer sought a replacement. Sample v. Aldi Inc., 61 F.3d 544, 548 (7th Cir.1995); Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1261 (7th Cir.1993), cert. denied, 114 S.Ct. 1372 (1994). A prima facie case of retaliation is set forth when "(1) [the employee] engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there was a causal link between the protected expression and the adverse action." Alexander v. Gerhardt Enterprises, Inc., 40 F.3d 187, 195 (7th Cir.1994). Under McDonnell Douglas, once the employee proves a prima facie case of racial discrimination or retaliation, there exists a presumption that the employer unlawfully discriminated or retaliated against the employee. McDonnell Douglas Corp., 411 U.S. at 802. This presumption then requires the employer to produce evidence of a legitimate reason for the adverse action. Id. However, if the employer presents such evidence, " 'the presumption ... is rebutted' and 'drops from the case.' " St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2747 (1993) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 n. 10 (1981)).
 
 
 10
 Jones claims that since the district court found that she had established a prima facie case of racial discrimination and retaliation, the VA's failure to provide evidence explaining why she was not reinstated as an LPN after her discharge as an RN required that judgment be entered in her favor. It is true that the record is devoid of any evidence explaining the VA's failure to reinstate Jones. Although the Review Board did not consider reinstatement, Dr. Best suggested to Mildred Brown that Jones be reinstated as an LPN. Since Brown did not testify, there is no explanation why Dr. Best's recommendation was not followed. Additionally, at the close of Jones' case, the district court found that she had presented a prima facie case of racial discrimination and retaliation. However, because the district court ultimately found that Jones had failed to prove a prima facie case of discrimination or retaliation, the VA never had any burden to present evidence explaining its failure to reinstate Jones as an LPN.[2]
 
 
 11
 In any event, since Jones' claims were fully tried on their merits, the VA's failure to present evidence explaining its failure to reinstate Jones as an LPN has no bearing on the district court's decision to enter judgment in favor of the VA. It is well-settled that "after a full trial on the merits, the intermediate burdens are of no consequence: we look only to whether 'the plaintiffs have demonstrated a pattern or practice of discrimination by a preponderance of the evidence. This is because the only issue to be decided at that point is whether the plaintiffs have actually proved discrimination.' " E.E.O.C. v. O & G Spring and Wire Forms Specialty Co., 38 F.3d 872, 878-79 (7th Cir.1994) (quoting Bazemore v. Friday, 478 U.S. 385, 398 (1986) (Brennan, J., concurring)); see also Watson v. Amedco Steel, Inc., 29 F.3d 274, 279-80 (7th Cir.1994). After a full trial, the district court found that the VA's decision to discharge Jones as an RN without reinstatement as an LPN was not the result of either racial discrimination or retaliation.
 
 
 12
 This brings us to Jones' next claim--that the evidence presented at trial required a finding of discrimination and retaliation. We disagree. The district court's factual findings must be accepted unless they are clearly erroneous. Hughes v. Brown, 20 F.3d 745, 747 (7th Cir.1994) (citing Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)). " '[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Anderson, 470 U.S. at 573 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). The district court's finding that the VA's discharge of Jones as an RN without reinstatement as an LPN was not motivated by discrimination or retaliation is not in error.
 
 
 13
 In entering judgment in favor of the VA, the district court first noted that there was no direct evidence of discrimination or retaliation. Additionally, the district court relied upon evidence demonstrating that Jones was unable to perform to the VA's legitimate expectations of both an RN and an LPN. The evidence introduced by the VA demonstrated that throughout her nine-month service as an RN at Hines, Jones was unable to foster positive working relationships with patients and staff, and that she had difficulties providing safe and proper treatment. Incidents regarding Jones' interpersonal relations included her use of obscenities, outbursts of anger, and failure to follow the directives of her superiors. (Joint Group Ex. 2, at C-24) (when Jones was transferred to another patient care assignment, she became upset and began screaming at her preceptor in front of other staff members and patients); (Joint Group Ex. 2, at C-24) (when asked for assistance in moving a patient while she was on break--she had been on her ten-minute break for thirty minutes--Jones became angry and stated that she should not be bothered on her break); (Joint Group Ex. 2, at C-3, C-8) (when Jones was given a low proficiency rating, she became angry, defensive, argumentative, and refused to sign the rating form); (Joint Group Ex. 2, at C-17) (when informed that she was not allowed to independently administer medication to patients, Jones began shouting obscenities); (Joint Group Ex. 2, at C-23, C-25, C-26) (Jones refused instruction from her superiors regarding several nursing procedures). Jones' difficulties in dealing with others was further evidenced by a March 1990 letter sent by a professor at the Loyola School of Nursing. In this letter, DiBiaso was asked to refrain from assigning Loyola nursing students to train alone with Jones because she had proven to be sarcastic and uncooperative with the student nurses. (Tr. at 284-85.).
 
 
 14
 A particularly egregious incident occurred when Jones was performing manual bowel care of a quadriplegic patient, Earl Morris. When Morris asked Jones to draw the curtain around his bed, Jones refused twice and told him that someone with his "long arms" should do his bowel care. (Joint Group Ex. 2, at C-20.) Jones' preceptor, Barbara LaVant, had to tell Jones to stop arguing and yelling. Id. Jones then took Morris for a shower and attempted to use the same washcloth for his face as she had used to clean his arms, the area between his legs, and his buttocks. Id. These events were confirmed by several of Jones' superiors. (Joint Group Ex. 2, at C-19, Tr. 263, 281, 304.)
 
 
 15
 Jones had other performance problems. In March of 1990, Jones erred in recording the amount of a medication that had been administered to a patient. (Joint Group Ex. 2, at C-18, C-21.) After this error by Jones, Bernadette Pohlmann, the clinical nurse educator and quality assurance coordinator for the SCI Service, reviewed the results of Jones' medication tests taken during the centralized orientation and learned that Jones had failed twice. (Tr. 229, Joint Group Ex. 2, at C-18.) Because of her poor medication calculation skills, Pohlmann recommended that DiBiaso require Jones to participate in one-on-one math review sessions, and that she prohibit Jones from administering medication without supervision until her skills improved. (Tr. 232.) DiBiaso implemented Pohlmann's recommendations. (Tr. 286.) However, despite her review sessions, Jones' difficulties continued. (Tr. 234-35; Joint Group Ex. 2, at C-2) (incidents occurring after her math sessions were completed included attempting to give a patient powdered medication without dissolving it in liquid; attempting to give a patient medication at the wrong time; and measuring a dose of liquid medication incorrectly).
 
 
 16
 Other incidents of deficient performance included Jones leaving an ongoing cardiac arrest to attend a scheduled math session with Pohlmann, (Tr. 236-39, Joint Group Ex. 2, at C-13, C-14); administering medication to a patient on her own, despite orders to the contrary, (Joint Group Ex. 2, at C-11); failing to follow DiBiaso's orders by transcribing a physician's order without supervision of an RN, and failing to follow proper procedure by neglecting to send a copy of the order to the hospital pharmacy, id.; and applying the wrong topical medication for tracheal care on a patient, causing the patient to suffer uncomfortable burning, (Joint Group Ex. 2, at C-7).
 
 
 17
 Jones was repeatedly counseled regarding her performance problems. (Joint Group Ex. 2, at A-18, C-3, C-7, C-8, C-9, C-10, C-11, C-13, C-14, C-15, C-16, C-22, C-23, C-24, C-25, C-26, C-27.)
 
 
 18
 This evidence was submitted to the Review Board. In recommending that Jones be discharged as an RN, the Board found that Jones was unable to foster positive working relationships with patients and staff, she failed to provide consistent and safe patient care, she received an adequate orientation, repeated counseling did not result in an improved performance, and the evidence presented demonstrated that it was not safe for Jones to continue to practice as an RN. (Joint Group Ex. 2, at C-32.)
 
 
 19
 Clearly, this evidence shows that Jones' performance as an RN was less than adequate. Likewise, there was evidence establishing that her performance as an LPN was deficient.
 
 
 20
 Although the Review Board did not consider reinstating Jones as an LPN and, therefore, did not issue an opinion regarding Jones' abilities as an LPN,[3] the chairperson of the Review Board, Barbara Negles, testified that Jones' performance problems during her probationary period as RN were so egregious that she was unfit to be reinstated as an LPN. (Tr. 198-203). She made this determination despite her knowledge that Jones had received fully successful performance appraisals in the past. (Tr. 204.) This opinion was confirmed by one of Jones' superiors, Margaret Kraft. (Tr. 261.) The district court agreed that many of Jones' performance deficiencies which rendered her unable to meet the legitimate expectations of the VA for an RN would also render her unfit as an LPN. Jones' most serious performance problems involved her harsh treatment of patients, her inability to interact with her co-workers and superiors in a professional manner, and her difficulties in administering medication and recording the doses given. Although these tasks were performed by Jones in her capacity as an RN, they are also important functions of an LPN--the duties of an LPN include administering medication and providing assistance to patients, see (Tr. 21); following the directives of superiors and otherwise acting in a professional manner is important to any health care position.
 
 
 21
 Moreover, there was evidence that Jones' performance as an LPN, prior to her promotion to the position of RN, was deficient. Judith Beck, an Associate Chief of Nursing at Hines, noted that in three emergency situations, while Jones was an LPN in June of 1988, her performance was unacceptable. (Joint Group Exhibit I, B-4.) In the first incident, Jones was advised by a patient that another patient was having a choking spell. Jones failed to do anything. In the second incident, Jones was twice informed by a nursing assistant that a patient was having a seizure in the shower. Again, Jones did nothing. As a result, the nursing assistant had to send a patient to get the nurse in charge, who had the patient transferred to intensive care. In the third incident, a patient told Jones that he was experiencing chest pain. Jones did not believe him. However, the nurse in charge ordered that Jones bring the patient to the emergency room. Jones argued with the head nurse in front of other patients, complaining that it was her dinner break.
 
 
 22
 Considering Jones' performance deficiencies as both an RN and an LPN, the VA's repeated counseling of Jones, its good faith efforts to correct her performance problems, coupled with the lack of any direct evidence of racial discrimination or retaliation, the district court's finding that the VA's decision to discharge Jones as an RN without reinstatement as an LPN was not motivated by discrimination or retaliation was not in error.
 
 
 23
 Jones argues that the district court erred in finding that her performance as an RN and an LPN was deficient and, therefore, it was compelled to find that Jones' discharge without reinstatement was motivated by discrimination or retaliation. To this point, she first notes that, as acting Director of Hines, Dr. Best suggested that Jones be reinstated as an LPN. Hence, Jones maintains, she must have met the VA's expectations for that position. However, the district court discredited Dr. Best's suggestion of reinstatement, choosing to rely on the opinions of Negles and Kraft, and evidence demonstrating Jones' serious performance problems. The district court did not abuse its discretion in doing so. See United States v. Brookins, 52 F.3d 615, 622 (7th Cir.1995) (" 'it is not the role of an appellate court to reexamine credibility determinations or reweigh the evidence.' ") (quoting United States v. DeCorte, 851 F.2d 948, 952 (7th Cir.1988)).
 
 
 24
 Jones also points out that she received positive ratings as an LPN for over twenty years, (Tr. 20-21, Plaintiff's Ex. 1), and that she performed well as an LPN at other hospitals after her discharge at Hines, (Tr. 44-51, R.11 at 6). As mentioned above, based on Jones' performance as an LPN and her performance during her probationary period as an RN, the district court was entitled to find that Jones did not meet the VA's legitimate expectations for an LPN at the time of her discharge. Jones additionally argues that she never actually gave a patient the wrong type or dosage of medication and that she never caused harm to a patient. Although Jones may not have seriously injured any patients, she did have difficulty administering medication. These errors were caught by her supervisors before any patients were harmed.[4] Jones also notes that two former co-workers at Hines (Cynthia Perkins Jackson, a nurse, and Billy Conley, a "housekeeper") testified that during her orientation as RN, Jones treated patients well, performed her assignments as well as other nurses, she did not use profanity, she was rarely given assistance, she was given more work than other nurses, and she was alienated by her co-workers. (Tr. 6-8, 100-03.) Additionally, she points to her own testimony, where she stated that many of her alleged performance problems never occurred. (Tr. 54-56, 63-64, 118-22.) The district court decided not to credit this testimony. Such a determination is within the district court's province as trier of fact and it will not be reversed.
 
 
 25
 Jones next argues that the circumstances surrounding her nine-month service as an RN and her eventual discharge required a finding of racial discrimination and retaliation. She first points to the temporal proximity between her EEO activity and the VA's allegedly unfair treatment of her and her ultimate discharge without reinstatement. It is true that such temporal proximity will allow the finder of fact to draw the inference that there is a causal connection between the employee's EEO activity and the adverse employment activity, Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1458 (7th Cir.1994); Johnson v. Sullivan, 945 F.2d 976, 980 (7th Cir.1991); Collins v. State of Illinois, 830 F.2d 692, 705 (7th Cir.1987), which, in turn, may support a prima facie case of retaliation. Nonetheless, after a full trial, the McDonnell Douglas prima facie case is of no relevance. Hence, the temporal proximity between Jones' EEO activity and the VA's adverse employment activity does not require a finding of retaliation.[5]
 
 
 26
 Jones next points to the VA's allegedly unfair and suspicious treatment of her during her service as an RN. Jones maintains that this was established with the following circumstantial evidence: (1) she was without a regular preceptor for several months and was not told that she had been assigned a substitute preceptor; (2) while a normal probation period lasts two years, hers only lasted nine months; (3) a medication error made by another nurse, Sylvia Quandt, was overlooked; (4) other nurses used profanity and were not disciplined; (5) a white employee was reinstated to her previous position when she failed to perform at a higher position; (6) many of her performance deficiencies never occurred; and (7) her personnel files documenting her prior service as an LPN were not presented to the Review Board.
 
 
 27
 This evidence, however, does not require a finding of either racial discrimination or retaliation. Jones first notes that she was without a regular preceptor for several months and that she was not notified of her substitute preceptor. However, the record demonstrates that she was assigned a substitute because her regular preceptor took personal leave. (Tr. 273-74.) In addition, DiBiaso testified that Jones was told who her substitute preceptor was. (Tr. 289-90.) Jones points out that her probationary period as an RN lasted only nine months, while the normal period is two years. Her probationary period, however, was cut short because of her performance problems.
 
 
 28
 Jones claims that other nurses were not discharged or otherwise disciplined for performance problems similar to hers. Specifically, at trial, Jones testified that Sylvia Quandt allegedly committed a medication error and other nurses used profanity. (Tr. 121-23); see also (Joint Group Ex. 2, at C-30) (Jones' report of Quandt's alleged medication error). However, there is nothing in the record to indicate that the overall performance of these nurses was as deficient as Jones'. Moreover, the district court was entitled to discredit Jones' testimony. Jones also argues that a white employee was reinstated after failing to perform at a higher position. While it is true that the VA conceded this point, (R.11 at 5, p 37), again, there is no evidence that this white employee's deficiencies were as serious and as numerous as Jones'.
 
 
 29
 Jones next contends that many of her performance deficiencies were non-existent. As we have already discussed, the district court credited the evidence presented by the VA establishing that Jones' performance problems did occur. Finally, Jones notes that her personnel files documenting her prior service as an LPN were not presented to the Review Board. This, however, was because the only issue before the Board was whether Jones should be discharged as an RN.
 
 
 30
 The district court's finding that the VA's decision to discharge Jones as an RN and its failure to reinstate her as an LPN was not motivated by racial discrimination or retaliation for engaging in EEO activity was not clearly erroneous. Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The Review Board did not make any decision regarding Jones' reinstatement as an LPN
 
 
 [2]
 We note that this finding, that Jones failed to prove a prima facie case of discrimination or retaliation, is not in conflict with the district court's earlier finding (at the close of Jones' case) that she had presented a sufficient basis to sustain a prima facie case. In finding that Jones had presented a prima facie case at the close of her case, Judge Conlon explained: "I will not say that the testimony is clear because I do not think it is, but I think there has been a sufficient basis to sustain a prima facie case at this point." (Tr. at 190.) Hence, at that point in the trial, the district court found only that Jones had presented sufficient evidence which, if believed, would support a prima facie case; not that a prima facie case had been proven by a preponderance of the evidence
 
 
 [3]
 The VA points out that the Review Board did not have the authority to consider reinstatement. Specifically, the VA notes that the Board's authority was limited by the Department of Medicine & Surgery Supplement, MP-5, Pt. II, Ch. 4, Sec. 4.06(d) (June 1, 1964), which provides:
 Upon completion of the board review, the board will meet in closed session to discuss its findings and arrive at an appropriate recommendation. The board may recommend any one or appropriate combination of the following--counseling, retention in the service, admonishment, reprimand, or separation.
 There is no provision for recommending reinstatement to a previous position.
 
 
 [4]
 Jones, however, did cause discomfort to at least one patient--she applied the wrong topical medication to a patient, causing him to suffer uncomfortable burning
 
 
 [5]
 Jones' first EEO activity began on December 27, 1988 with the filing of her first complaint. This complaint was eventually settled, resulting in Jones' promotion to RN beginning in September of 1989. During her orientation period as an RN, Jones received poor performance appraisals and, believing that she was being treated unfairly, she sought EEO counseling. As a result of these unsatisfactory performance reports, a Review Board was convened to determine whether Jones should be discharged. Pending official action on her status as an RN, on July 9, 1990, Jones was transferred to Nursing Education at Hines to perform clerical duties. On August 16, 1990, the Review Board recommended that Jones be discharged as an RN. Before she was officially terminated, however, Jones filed a second EEO complaint on November 30, 1990, complaining of her transfer to Nursing Education. Jones was officially terminated on February 8, 1991. Thereafter, she filed her third EEO complaint on March 28, 1991, alleging that her discharge without reinstatement was motivated by racial discrimination and was in retaliation for her EEO activity. The VA's alleged adverse employment actions (i.e., the unfavorable performance evaluations, Jones' transfer to Nursing Education, the convening of the Review Board, and her ultimate discharge without reinstatement) were sufficiently close in time to Jones' EEO activity (i.e., the filing of her first two EEO complaints and her EEO counseling) that they might support an inference that Jones' discharge without reinstatement was causally connected to her EEO activity